## CLAY v. CHESAPEAKE & POTOMAC TELEPHONE CO.

No. 10315.

United States Court of Appeals District of Columbia Circuit.

Argued March 17, 1950.

Decided Aug. 7, 1950.

Prettyman, Circuit Judge, dissented.

———◆———

Mr. Robert H. Driskill, Washington, D. C., with whom Mr. Lester Wood, Washington, D. C., was on the brief, for appellant.

Mr. Karl Michelet, Washington, D. C., with whom Mr. Michael J. Keane, Jr., Washington, D. C., was on the brief, for appellee.

Before PRETTYMAN, BAZELON and FAHY, Circuit Judges.

BAZELON, Circuit Judge.

Plaintiff [1] was engaged part-time in the business of supplying orchestras for dances, weddings and banquets. One of the two telephones at his home, Georgia 6012, was used for this business and was advertised in the classified directory. When plaintiff's wife secured employment in downtown Washington and was no longer able to take calls at the Georgia number, plaintiff requested that the advertised number be reassigned to his wife's place of employment. Although his request was denied, because it involved a transfer outside the Georgia exchange area, he was assured by the Company that the same result could be accomplished by its not assigning the Georgia number until a new directory

1. Appellant was the plaintiff below and will be referred to here as "plaintiff." Appellee was the defendant below and will be referred to here as "the Company."

appeared. Meanwhile, all calls to the old number were to be referred to the telephone at the new location. According to plaintiff's allegations, he relied upon the Company's assurance that the above would be done, abandoned any attempt to find an alternative solution, contracted for the new number, and continued to pay the charges for his advertisement of the Georgia number. After about five months, however, the old number was reassigned to someone else (no directory publication intervening), and calls to that number were no longer referred to plaintiff. Notice to the Company of the interruption in reference service, which lasted 48 days, resulted in a second assurance that calls to the old number would be directed to plaintiff—this time by means of a "split reference" service. Briefly, this entailed the following: When the old number was called, an operator would answer and inquire which of the two parties was wanted and then refer the call to the proper party. Despite its prior assurances to plaintiff, the Company acceded to complaints from the person newly in possession of plaintiff's former number and withdrew the "split reference" service without notice to plaintiff after it had been in use for ten days. Once again, plaintiff was promised that the error would be corrected, and thereafter there were no difficulties. But by this time, according to plaintiff's allegations, his customers no longer sought him out and his business was greatly damaged.

Plaintiff brought suit against the Company on two counts—one in contract, the other in tort. Summary judgment was awarded against him below on both counts, the court stating in its opinion that "there is no cause of action for damages. The Court does not feel that there is any breach of contract shown or any tort." Although not entirely clear, it seems to us that the court ruled not that plaintiff's damages were de minimis, but rather that the pleadings, affidavits and depositions on file demonstrated that the Company had not breached any duty owed by it to the plaintiff. If it were once assumed that the Company had incurred an obligation to provide the reference service to plaintiff, summary judgment for the Company would be precluded, for there is no dispute that such service was interrupted several times and ultimately discontinued.[2]

■■ As we view the situation, there was a bilateral contract, the Company promising to furnish reference as well as ordinary service, the plaintiff promising to take and to pay for the new number. The Company mistakenly contends that there is no contract because it, the promisor, has received no valuable consideration. It is elementary contract law that neither money nor benefit moving to the promisor is essential to a contract; consideration may consist as well of detriment to the promisee. The essence of consideration, however, at least as viewed in the American Law Institute, Restatement of Contracts § 75, is that it is a bargained-for equivalent. Thus, plaintiff's single promise to take and to pay for the new phone was adequate consideration

2. The following excerpts from the transcript of record seem to us to demonstrate clearly that the trial court awarded summary judgment because it believed plaintiff had not made out a cause of action in either contract or tort, i. e., that defendant owed no duty to plaintiff:

"The Court: Mr. Wood, I am not going to grant this motion for summary judgment on the question of damages, because if the plaintiff has a cause of action he is entitled to recover at least nominal damages, if he can prove actual damages. I have a great deal of doubt whether he has a cause of action. I should be very glad to hear from you on that. [Tr. p. 14]

*   *   *   *   *   *

"You need not go into that, because I am not going to dismiss this case on the question of damages. If there is a cause of action, the plaintiff is entitled to prove damages at the trial. [Tr. p. 18]

*   *   *   *   *   *

"I am not going to dismiss the case on the question of damages, because I think you have a right to try to prove damages. But I have grave doubt as to whether you have a cause of action." [Tr. p. 19]

for any number of promises or performances on the other side.[3]

■ The only possible bar to the Company's liability would be that its agent had acted outside the scope of both his express and apparent authority when he promised reference service to plaintiff at no extra charge. There can be no doubt, however, that the Company's representative was acting within his authority, for the promise of reference service accorded with the Company's customary practice in such situations.[4] If plaintiff had thought the Company had not obligated itself to supply reference service as part of the consideration for his taking the new phone, he might have done all the things retrospectively and belatedly suggested by the Company to prevent loss of customers. Thus, he might have informed those he knew that his telephone number had been changed. And to avoid the possibility that new customers might be prematurely lost or misdirected, he might have retained the old number and forborne entirely from taking the new phone.

■■ The Company also assumes that unless a specific charge could be made for the reference service, i.e., unless its tariff schedule on file with the Public Utilities Commission permitted such a charge, the Company could assume no obligation to perform it. Such a view disregards the obvious fact that public utility status alone does not deprive a company of the power to contract.[5] If followed, it would immunize the Company from liability for any of the incidental obligations incurred on its behalf by agents acting within their express or apparent authority. The root of the error in this contention is its failure to recognize that contractual duties may be assumed by the parties without regard to public obligation, so long as they contravene neither law nor dominant public policy. So here, although we make no effort to decide whether or not the Company was obligated, by virtue of its public utility status alone, to supply reference service to those who change phones during the period between directories, we see no reason why it could not contract to provide such service. Nor do we see any element of discrimination in a contract with one subscriber for a service which is customarily offered to all similarly situated subscribers.[6]

Since we find that the Company assumed the obligation to furnish reference service to this particular subscriber, there is no need to discuss the tort question of what its responsibility would be if there were no contract.

■ We hold that, in the present posture of the case, the undisputed facts show that the Company contracted to provide reference service to plaintiff and subsequently breached such contract. The award of summary judgment to the Company was therefore improper.

Reversed and remanded for action in accordance with this opinion.

PRETTYMAN, Circuit Judge (dissenting).

I disagree with my brethren in this case. The trial court said: "The Court does not feel that there is any breach of contract shown * * *." I agree with that.

A few facts must be noted. They are not in dispute. Plaintiff was a full-time Government employee. He was also a sundown orchestra broker, booking bands for parties,

---

3. See 1 Williston, Contracts § 137A (1936); U. S. Fidelity & Guaranty Co. v. Cahill, 1936, 264 Ky. 135, 94 S.W.2d 320.

4. Cf. Cumberland Telephone & Telegraph Co. v. Brandon, 1913, 154 Ky. 644, 157 S.W. 1119, 1121; Cumberland Telephone Co. v. Brown, 1900, 104 Tenn. 56, 55 S. W. 155, 156, 50 L.R.A. 277, 78 Am.St. Rep. 906.

5. 52 Am.Jur., Telegraph and Telephones, § 15; See Cumberland Telephone Co. v. Brown, supra, note 4.

6. In response to a question from the bench in the proceedings below, counsel for the Company said: "The telephone company has this situation: It does not want information to be overloaded; therefore, when a number is changed, the company will, *in the normal course of events,* make arrangements for referring calls." [Emphasis supplied.]

meetings, etc. Prior to July, 1947, his wife was not employed. They had two phones in their home, Georgia 6012 and Taylor 1381. Plaintiff advertised in the classified section of the telephone directory, showing the Georgia number and also showing the Taylor number as his night, Sunday and holiday number. In July, 1947, Mrs. Clay obtained daytime employment in a downtown office. They then had a phone, National 3257, installed at her office desk. So we have three phones involved, a Taylor number which remained untouched throughout, a Georgia number which was taken out, and a National number which was installed. The Taylor number would not answer to a call in the daytime, and the National number would not answer to a call in the evening.

The contract which plaintiff says he made with the Company was that all calls to him at the Georgia number be transferred to the National number. But he testified that "I can't prove that anyone called" the Georgia number and was not transferred. Later he testified that he had written statements from two persons who called him at the Georgia number and could not get him. But those persons said they called at 7:30 p. m. and at 7:50 p. m., respectively. If those calls had been referred to the National number pursuant to the alleged contract, they would have received no answer, as that number answered only when Mrs. Clay was at her office during regular office hours. That is all the proof there was on breach.

For proof of breach appellant apparently relies upon the assertion that he received no calls. But the fact is that if the Company had referred to the National number all calls to appellant at the Georgia number, and if all such calls had been made after 5:00 or 5:30 p. m., when appellant was available to do business, he would have received no calls at all; the National number would have been rung but no one would have answered. There is no proof, and appellant said he had none, that any daytime calls were attempted.

Moreover, it is significant, I think, that Clay received no evening calls on the Taylor number, although that phone remained undisturbed throughout the period. If customers were actually trying to get him, it seems peculiar that nobody called him in the evening on the phone advertised as his evening phone.

The sum of it is that if all Clay's calls in this period came in the evening on the Georgia number, and if the Company transferred those calls to the National number, as Clay claims it should have done, he would not have received a single call. I think, as the trial judge held, that no breach of contract was shown by the plaintiff in this action.

In the next place, I think that appellant did not establish a contract. There are three phases to this feature of the case. (a) The written contract between him and the Company provided, in clear type just above his signature, that it was subject to the rules and regulations of the Company. Those regulations are published, under requirement of law. One regulation provided:

" * * * In view of the possibilities of errors, arrangements * * * for advising calling parties of the telephone number of a station at which the subscriber may be reached, are made with the understanding that the subscriber assumes all risks in connection therewith and that no liability shall attach to the Company by reason of failure to complete a particular call."

(b) The Company could not legally make such a contract. Negligence or other tort by a public utility is one thing, but a contract by a public utility is something else. A basic tenet in public utility law is that a utility cannot render to one person a service which it does not render to all under like conditions. To enforce that requirement, the regulatory statutes require utilities to file publicly the rules and regulations relating to service. The statutes then make unlawful any deviation from the published rules. The District statutes have such provisions.[1] The service involved in the case at bar, the so-called "split reference", was not included in the Company's published rules. The court now holds that

1. See D.C.Code, tit. 43, §§ 324, 902, 904 (1940).

a contract between one individual and the Company for that service is binding. I do not see how it could be. It seems to me that one of the foundation stones of effective utility regulation in this jurisdiction is disintegrated by the rule now promulgated by the court. (c) The evidence did not establish a contract as a matter of fact. Appellant's wife talked on the phone to an unidentified person at the Company's office, who told her that calls to the Georgia number would be referred to the National number and that there would be no charge for such reference. There was no consideration even alleged, quite apart from the question whether an unidentified person on a phone can bind a corporation to a contract contradictory of a writing executed by the same parties. The court says that the plaintiff's promise to take and pay for a new phone was consideration sufficient to support a binding contract to refer calls. I do not agree with that view. Appellant had a phone; he gave that phone up and took another one, a mere exchange of phones all at his, not the Company's, instance. I do not see how the taking of the new phone was either a consideration moving to the Company or a detriment to Clay.

In the next place, it seems to me that under the circumstances it was incumbent upon appellant to take some step to effectuate the transfer of his incoming calls to the number at which he wanted them received. He had the Georgia phone. He testified that he had advertised it by penny postcards, picture cards, and card advertising. So he must have had an address list of potential customers. Also he had the number registered at union headquarters. He, not the Company, relinquished the Georgia phone for reasons of his own. But he testified that he made no attempt to advertise the new number (National 3257) or any change in number until after the new telephone directory was published in March or April, 1948, after the period here involved. It seems to me that under those facts he did not show a cause of action for damages for the destruction of his business by breach of a contract with the Company. When he, himself, changed his number, he could not, it seems to me, rest the blame for lack of business entirely on the Company without any effort whatever on his part to effectuate the transfer. The undisputed facts simply negative the cause of action he asserted.

In the last place, the testimony of appellant and his wife affirmatively negative any possibility of proof of damages. They testified that they had no records of business in prior years. The only records they ever had were scraps of paper, and they had largely been destroyed. Mrs. Clay made up some "statements" for the purposes of this case. She testified that she made them up from "such slips of paper as I had about the telephone calls, and from the calendar or from various paper publicity that we had on the jobs, and from what Mr. Clay and I could remember at the time this was made up." They had no records of expenses or of the amount of the net profit. It seems to me that when the undisputed evidence is affirmative in its showing that no proof is available to prove the amount of damages in the destruction of a business—that is, the amount of the business, if any, which was destroyed—the trial court may properly grant summary judgment in the action.

I do not know what my brethren intend that the trial court do with the case. If it proceeds to a trial it would be trying issues which the parties agree, and the trial court has found, do not exist. If this court means that summary judgment should be entered for the plaintiff and trial be had as to the amount af damages, the trial court would have to attempt to receive evidence which has already been affirmatively shown not to exist.